**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| | **NO.  15-138** |
| **v.** | |
| | |
| **JAMES DAVIS** | **-01** |
| **JOHN GREEN** | **-02** |

**OPINION**

John Green, former Sheriff of Philadelphia, and James Davis, a Philadelphia business

owner, are charged with conspiracy to commit honest services fraud and extortion under the

Hobbs Act, 18 U.S.C. § 371, as well as substantive and conspiratorial honest services fraud.  18

U.S.C. §§ 1343, 1346, 1349.  The Government alleges that Green and Davis participated in a

*quid pro quo*, in which Green accepted a stream of personal benefits in exchange for maintaining

a lucrative contract between the Sheriff's office and Davis's businesses.  According to the

Government, this exchange deprived Philadelphia and its citizens of Green's honest services as

Sheriff.  Both Green and Davis have moved to dismiss these charges.  For the reasons that

follow, Defendants' motions to dismiss shall be denied.

**I.   FACTUAL ALLEGATIONS**

The gravamen of the Superseding Indictment focuses on the stream of personal benefits

that Defendant James Davis allegedly provided to Defendant John Green while Green was

Sheriff of Philadelphia.  Green was the elected Sheriff for the Office of the Sheriff, City and

County of Philadelphia ("PSO") from around 1988 through December 2010.  Davis owned two

companies, Reach Communications Specialists, Inc. ("Reach") and RCS Searchers, Inc. ("RCS")

that provided services to Green and the PSO.

The Superseding Indictment alleges that Davis provided this stream of personal benefits when the PSO contracted with Reach and RCS to help the PSO's sales of real property in Philadelphia that was subject to mortgage foreclosure, tax lien, and tax delinquency.  Davis allegedly:

- hired and paid Green's wife as a subcontractor;

- provided approximately $210,000 in hidden and unlawful campaign contributions to Green's 2007 reelection campaign for Sheriff;

- gave approximately $320,000 in gifts and interest-free loans to Green, which helped him purchase a retirement home in Florida.

The Superseding Indictment alleges that Davis gave these personal benefits to Green in exchange for Davis's companies, Reach and RCS, maintaining and receiving more PSO business.  No other vendors were allegedly allowed to bid and compete against Reach and RCS for services rendered to the PSO during its Sheriff's sales.  Green purportedly accepted these alleged personal benefits, knowing that they were given in exchange for the official act of hiring Reach and RCS.

Green and Davis allegedly concealed their financial arrangement by, *inter alia*, the following acts:

- Green failed to disclose the receipt of gifts and loans from Davis on the annual statement of financial interests that Green was required to file with the Commonwealth of Pennsylvania and the City of Philadelphia;

- Green failed to disclose his wife's financial interest in contracts between the PSO and Davis's companies;

- Davis used "straw parties" to conceal campaign contributions to Green in excess of the contribution limits established by the Commonwealth of Pennsylvania and the City of Philadelphia; and,

- Green failed to disclose on the campaign finance forms required by the Commonwealth of Pennsylvania and the City of Philadelphia the receipt of money and services provided to him by Davis.

According to the Superseding Indictment, this pattern of misconduct deprived the citizens of Philadelphia and property owners who lost their properties at Sheriff's sales of Green's honest services as an elected Sheriff.  Thus, Counts I to V of the Superseding Indictment charge each Defendant with (i) conspiracy under 18 U.S.C. § 371 to commit honest services fraud and Hobbs Act Extortion (Count I) and (ii) substantive and conspiratorial honest services fraud, 18 U.S.C. §§ 1343, 1346, 1349 (Counts II to V).[1]

Defendants have moved to dismiss all five Counts on three separate grounds.  First, Defendants contend that the Counts are all time-barred under the applicable statute of limitations. Second, Defendants contend that the Superseding Indictment pleads with insufficient specificity the requisite *quid pro quo* between Davis's campaign contributions and Green's official acts as Sheriff.  Alternatively, Defendants move to strike all allegations related to the campaign contribution from the Superseding Indictment.  Third, Defendants argue that the Government provided erroneous legal instructions to the grand jury that warrant dismissal of the five Counts.

## II.    LEGAL STANDARD

Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure permits a pre-trial motion to dismiss an indictment for lack of specificity and failure to state an offense.  Fed. R. Crim. P. 12(b)(3)(B).  On a pre-trial motion to dismiss, factual allegations as set forth in the indictment must be taken as true.  *See United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012).  The inquiry is "whether, assuming all of those facts as true, a jury could find that the defendant committed the offense for which he was charged."  *Id*. at 596.  The analysis at this stage is limited, "geared only towards ensuring that legally deficient charges do not go to a jury."  *United States v. Bergrin*, 650 F.3d 257, 268 (3d Cir. 2011).  An indictment is "facially sufficient if it (1) contains

---

[1] The Superseding Indictment contains other Counts that are not at issue in the pending motions to dismiss.

the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of

what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what

extent he may plead a former acquittal or conviction in the event of a subsequent prosecution."

*Huet*, 665 F.3d at 595 (internal quotation marks omitted).

## III.   STATUTE OF LIMITATIONS

Defendants argue that Counts One through Five of the Superseding Indictment are time

barred under the five-year statute of limitations.  As relevant here, the statute of limitations

provides that "no person shall be prosecuted, tried, or punished for any offense, not capital,

unless the ***indictment is found*** or the information is instituted ***within five years*** next after such

offense shall have been committed."  18 U.S.C. § 3282(a) (emphasis added).  An indictment is

"found" when it is returned by a grand jury and filed.  *United States v. Oliva*, 46 F.3d 320, 324

(3d Cir. 1995).  Although the date of the original indictment typically controls for statute of

limitations purposes, the date of the superseding indictment applies if it "materially broaden[s] or

substantially amend[s] the charges in the first."  *Id*.  Filed on December 15, 2015, the

Superseding Indictment here contains amendments that, according to Defendants, include

substantial and material changes from the original indictment.  The Government has not disputed

this.  Accordingly, the central question is whether the Counts allege relevant criminal acts that

post-date December 15, 2010.  If they do not, the Counts fail under the statute of limitations.

### A.   Count I – Conspiracy

"For a conspiracy indictment to fall within the statute of limitations, it is 'incumbent on

the Government to prove that . . . at least one overt act in furtherance of the conspiracy was

performed' within five years of the date the Indictment was returned."  *United States v.*

*Bornman*, 559 F.3d 150, 153 (3d Cir. 2009) (quoting *Grunewald v. United States*, 353 U.S. 391

(1957)); *United States v. Jake*, 281 F.3d 123, 129 n.6 (3d Cir. 2002) ("A conspiracy is a

4

continuing offense and a jury may consider each and all of a defendant's actions in furtherance of the conspiracy so long as the indictment is brought within five years of the last overt act."). Count I charges Davis and Green with conspiracy under 18 U.S.C. § 371 to commit (i) honest services fraud in violation of 18 U.S.C. §§ 1343 and 1346; and (ii) Hobbs Act extortion in violation of 18 U.S.C. § 1951(a).[2]  Defendants contend that the Superseding Indictment is bereft of any overt act in furtherance of a conspiracy as to either crime that falls within the five-year statute of limitations.

At the outset, the "crucial question" here is the "scope of the conspiratorial agreement" of the two crimes because the scope "determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." *Bornman*, 559 F.3d at 153 (quoting *Grunewald*, 353 U.S. at 396).  As formulated in the Superseding Indictment, the scope of Defendants' honest services fraud and Hobbs Act extortion conspiracy is a *quid pro quo* between Davis and Green:  in exchange for a stream of personal benefits such as monetary gifts and interest-free loans, Green, in his capacity as Sheriff, performed official acts to the financial benefit of Davis.  These official acts included maintaining a business relationship between the PSO and Davis's companies, Reach and RCS, for the Sheriff's sales.

The Superseding Indictment sufficiently identifies two types of overt acts in furtherance of the alleged *quid pro quo*, based on specific payments exchanged between the Defendants. First, by alleging that Defendants transmitted two checks dated December 29, 2010 for services rendered by Reach and RCS for the PSO, the Government identified an overt act in furtherance of the conspiracy.  Sup. Indict., p. 23 ¶ 51.  Indeed, these two checks reflect the monetary gain

---

[2] Extortion includes "obtaining the property from another, with his consent . . . under color of official right."  18 U.S.C. § 1951(b)(2).

that would inure to Davis's benefit in providing services to the PSO.  Second, the Superseding

Indictment pleads the other half of the *quid pro quo* by alleging a kickback from Davis to Green

in the form of an unpaid $10,000 loan dated September 28, 2011.  Sup. Indict., p. 17 ¶ 25.  The

loan, in turn, reflects the monetary gain that inured to Green's benefit in having his office, the

PSO, contract with Davis's companies.

Defendants' reference to *United States v. Doherty*, 867 F.2d 47 (1st Cir. 1989), does not

compel a different result.  In *Doherty*, policemen were charged for conspiring to steal civil

service examinations and to sell them to other policemen so they could cheat and obtain higher

pay.  *Id*. at 51.  Although the Government contended that each salary payment that the policemen

received was an overt act, the *Doherty* court concluded otherwise.  *Id*. at 61.  As the *Doherty*

court reasoned, the salary payments were but part "of a lengthy, indefinite series of ordinary,

typically noncriminal unilateral actions."  *Id*.; *see also United States v. Grimm*, 738 F.3d 498,

502-04 (2d Cir. 2013) (concluding that receipt of interest payments on municipal bonds received

over an indefinite period of time was not overt act in furtherance of a conspiracy).  Here,

Defendants claim that the two wired checks and unpaid loan fit the *Doherty* description and

therefore may not be considered as overt acts for the conspiracy claim.

Even if *Doherty* – a case from the First Circuit – had any precedential value here in the

Third Circuit, the opinion's rationale does not bar the Government's conspiracy claim.  The two

checks dated December 29, 2010 and unpaid loan are not unilateral actions within the meaning

of *Doherty* because of the Defendants' alleged concerted action.  *Cf.* 738 F.3d at 61-62 (noting

that payoffs requiring cooperation are not forms of unilateral activity).  Indeed, under the four

corners of the Superseding Indictment, the two checks and unpaid loan involved cooperation

between Green and Davis.  More specifically, the checks were charged as part of the improper

6

*quid pro quo* in which the PSO paid Davis's companies in exchange for personal benefits to Green, such as the unpaid loan.  The better analytical framework is found in cases which hold that where a conspiracy is economically motivated, the receipt of anticipated profits, such as the two checks and unpaid loan, serves as an overt act.  *See United States v. Vasquez-Uribe*, 426 Fed. App'x 131, 135 (3d Cir. 2011) (holding that "where enrichment is an object of a conspiracy, the conspiracy continues until the conspirators receive the full economic benefits anticipated by their scheme.") (quoting *United States v. McNair*, 605 F.3d 1152, 1214 (11th Cir. 2010)); *see also United States v. Rutigliano*, 790 F.3d 389, 400 (2d Cir. 2015) (noting that holding of *Grimm*, which relied on *Doherty*, represented a "narrow exception" to the "ordinary rule . . . that a conspirator's receipt of anticipated benefits within the limitations period can, by itself, constitute an overt act in furtherance of an ongoing conspiracy.").[3]  Because these two checks and the unpaid loan are overt acts in furtherance of the alleged conspiracy that post-date December 15, 2010, Count I, the conspiracy claim, is not time barred.

---

[3] Cases from other circuits overwhelmingly hold that the receipt of expected profits in economically motivated conspiracies constitutes an overt act.  *See, e.g., United States v. Fitzpatrick*, 892 F.2d 162, 167-68 (1st Cir. 1989) ("[A] conspiracy continues until the anticipated economic benefits of the defendant are realized."); *United States v. Mennuti*, 679 F.2d 1032, 1035 (2d Cir. 1982) ("[A] conspiracy continues until the conspirators receive their payoffs."); *United States v. Salmonese*, 352 F.3d 608, 616 (2d Cir. 2003) ("This court has consistently ruled that where a conspiracy's purpose is economic enrichment, the jointly undertaken scheme continues through the conspirator's receipt of their anticipated economic benefits.") (internal quotation marks omitted); *United States v. A-A-A- Elec. Co., Inc.*, 788 F.2d 242 (4th Cir. 1986) ("[F]or purposes of determining the statute of limitations, a Sherman Act conspiracy continues through the time of illegal payoffs and receipt of payments."); *United States v. Girard*, 744 F.2d 1170, 1172 (5th Cir. 1984) ("[T]he conspiracy continued until [defendant] had realized fully his anticipated economic benefits."); *United States v. Hedman*, 630 F.2d 1184, 1199 (7th Cir. 1980), *cert. denied*, 450 U.S. 965 (1981) ("[E]nvision[ed] multiple payments over several years" for conspiracy to commit Hobbs Act extortion constituted overt act); *United States v. N. Improvement Co.*, 814 F.2d 540, 542-44 (8th Cir. 1987) ("We have no difficulty in concluding that the conspiracy charged in the indictment continued until Northern Improvement received payment and, accordingly, the five-year statute of limitations had not run against the defendants."); *United States v. Inryco, Inc.*, 642 F.2d 290, 294-95 (9th Cir. 1981), *cert. dismissed*, 454 U.S. 1167 (1982) (bid-rigging conspiracy in violation of Sherman Act continued past the rigged bids to the provision of rewards generated by the conspiracy to coconspirator); *United States v. Evans & Assocs. Constr. Co., Inc.*, 839 F.2d 656, 660-61 (10th Cir. 1988) (receipt of payments at anti-competitive levels in violation of Sherman Act "was sufficient to delay" statute of limitations date); *United States v. Helmich*, 704 F.2d 547, 548-49 (11th Cir. 1983), *cert. denied*, 464 U.S. 939 (1983) (conspiracy to commit espionage for money continues until the conspirators receive their anticipated economic benefit).

### B. Counts II to V – Substantive and Conspiratorial Honest Services Fraud

Counts II to V charge Defendants with substantive and conspiratorial honest services fraud by wire transfer. 18 U.S.C. §§ 1343, 1346, 1349. These Counts generally aver that Defendants devised and intended to devise a scheme to defraud Philadelphia of Green's honest services as Sheriff so that they could obtain money and property by fraudulent means.

For honest services fraud, the statute begins to run "when the wire communication is transmitted." *United States v. Mikanda*, 416 Fed. App'x 126, 128 (3d Cir. 2011); *see also United States v. Hoffecker*, 530 F.3d 137, 157 (3d Cir. 2008) ("The statute begins to run for mail fraud when a defendant places, deposits, causes to be deposited, takes, or receives mail, or knowingly causes mail to be delivered as part of the execution of a scheme to defraud . . .") (internal citation and quotation marks omitted). Each Count here identifies a wire communication that post-dates December 15, 2010 and therefore none will be dismissed.

Counts II and III refer to two checks, both dated December 29, 2010, wired from PSO to Reach. Just as these two checks support Count I for conspiracy, so too do they support Counts II and III for substantive and conspiratorial honest services fraud: the checks are alleged as part of a *quid pro quo* between the Defendants, in which Green would receive personal benefits after his office, PSO, contracted with Davis's company.

Count IV refers to a bank wire transfer, dated December 20, 2010, of over $200,000 from Davis to Green's title agent so that Green could complete the purchase of his Florida retirement home. Like Counts II and III, Count IV relates to the *quid pro quo* between the Defendants and is therefore a relevant wire communication that falls within the statute of limitations.

Count V alleges that on January 31, 2011, Defendants transmitted an image of a 2010 Annual Campaign Finance Report of Green's campaign committee that falsely reported about $30,000 of unpaid campaign debt to Davis's company, Reach.

8

Although this transmission occurred after Green retired as Sheriff, it still constitutes a wire transmission that was in furtherance of the alleged honest services fraud.  As explained in the mail fraud context,[4] it is not the scheme to commit fraud that violates federal law.  *United States v. Oxman*, 740 F.2d 1298, 1304 (3d Cir. 1984), *vacated and remanded on other grounds by* 473 U.S. 922 (1985).  Rather, it is the transmission used to "effectuate the scheme" that is prohibited.  *Id.*; *see also United States v. Lane*, 474 U.S. 438, 452-53 (1986) (upholding mail fraud jury instructions which provided that mailings facilitating concealment of the fraudulent scheme are covered by the mail fraud statute).  Here, the 2010 Annual Campaign Finance Report was a transmission in furtherance of the honest services fraud because it created a false report that was designed to conceal one of the benefits that Davis conferred upon Green – the illegal financing of his Sheriff campaign.  According to the Superseding Indictment, part of the honest services fraud scheme was to conceal the extent of Davis's support for Green's campaign for reelection.  Sup. Indict., p. 10 ¶ 36.  Thus, even though the Finance Report was transmitted after Green's retirement, it was still used to "effectuate the scheme" of concealing Davis's contributions while Green was Sheriff.  *See Oxman*, 740 F.2d at 1304; *see also United States v. Eckhardt*, 843 F.2d 989, 993 (7th Cir. 1988) ("It is therefore irrelevant when the fraud scheme itself ended, so long as the charged call or mailing took place within the statutory period.").  Accordingly, the wire transmission of Count V falls within the statute of limitations.

In sum, Counts I to V allege relevant acts that post-date December 15, 2010.  Defendants' joint motion to dismiss the Superseding Indictment based on the statute of limitations shall be denied.

---

[4] The mail fraud statute is identical to the wire fraud statute except the latter "speaks of communications transmitted by wire."  *See United States v. Frey*, 42 F.3d 795, 797 (3d Cir. 1994).

9

## IV.     FAILURE TO STATE AN OFFENSE

In *McCormick v. United States*, the Supreme Court held that a Hobbs Act extortion

conviction based on a public official's receipt of campaign contributions requires an "***explicit***

promise or undertaking by the official to perform or not to perform an official act."  500 U.S.

257, 273 (1991) (emphasis added).  According to Defendants, the Superseding Indictment fails to

state an offense under *McCormick* because Counts I to V do not tie Davis's campaign

contributions to Green's specific official acts as Sheriff.  Defendants thus seek dismissal of these

Counts due to this purported pleading defect.  In the alternative, they seek to strike allegations

pertaining to Davis's campaign contributions under *McCormick*.

### A.  Honest Services Fraud

Honest services fraud based on a wire transmission requires three elements: "(1) the

defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the

specific intent to defraud, and (3) the use of . . . interstate wire communications in furtherance of

the scheme."  *See United States v. Andrews*, 681 F.3d 509, 518 (3d Cir. 2012).  The phrase

"'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible

right of honest services."  *Id.* (quoting 18 U.S.C. § 1346).  Honest services fraud only

criminalizes bribery and kickback schemes.  *Skilling v. United States*, 561 U.S. 358, 408-09

(2010).

Whether the Superseding Indictment has stated an offense for honest services fraud

requires a two-step inquiry: (1) does *McCormick*, as a threshold matter, apply to allegations

related to honest services fraud, and; (2) do the Counts adequately plead honest services fraud as

predicated upon campaign contributions given in exchange for official acts?

First, this Court assumes without deciding two aspects of *McCormick*.  Although

*McCormick* focused solely on Hobbs Act extortion, Defendants have not identified any Third

10

Circuit precedent which has held that *McCormick*'s requirement of an explicit promise or undertaking extends to other crimes such as honest services fraud. *See United States v. Salahuddin*, 765 F.3d 329, 343 n.9 (3d Cir. 2014) (noting that "[a]n explicit *quid pro quo* is required for **extortion** based upon campaign contributions") (emphasis added); *United States v. Ring*, 706 F.3d 460, 466 (D.C. Cir. 2013); *but see United States v. Menendez*, 132 F. Supp. 3d 635, 642 (D.N.J. 2015) (concluding that *McCormick* applies to bribery under 18 U.S.C. § 201(b)).[5] Further, *McCormick* discussed the propriety of jury instructions, not pleading requirements of an explicit promise or undertaking under the Federal Rules of Criminal Procedure.[6] *See* 500 U.S. at 273; *but see Menendez*, 132 F. Supp. 3d at 641-42 (applying purported *McCormick* pleading standard). Indeed, Defendants have not pointed to any Third Circuit precedent which holds that *McCormick* demands a heightened particularity standard for pleading honest services fraud.

Second, even if *McCormick* does apply, Counts II through V adequately plead the explicit *quid pro quo* between Green and Davis. So long as a public official accepts money "in exchange for a specific requested exercise of his or her official power," *McCormick* is satisfied. *See Evans v. United States*, 504 U.S. 255, 258 & 268 (1992) (holding that jury instruction with quoted language satisfied the *quid pro quo* requirement of *McCormick*); *see also Salahuddin*, 765 F.3d at 343 n.9; *United States v. Blandford*, 33 F.3d 685, 696 (6th Cir. 1994) (noting that

---

[5] At oral argument, the Government stated that the current trend in the case law has expanded *McCormick* to encompass crimes besides Hobbs Act extortion.

[6] *McCormick* and case law following it suggest that determining whether a *quid pro quo* is "explicit" is a jury function, as opposed to a pleading requirement. *See McCormick*, 500 U.S. at 270 ("It goes without saying that matters of intent are for the jury to consider."); *Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring) ("[T]he trier of fact is quite capable of deciding the intent with which words were spoken or actions taken as well as the reasonable construction given to them by the official and the payor."); *United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013) ("As most bribery agreements will be oral and informal, the question is one of inferences taken from what the participants say, mean and do, all matters that juries are fully equipped to assess.").

"the *quid quo pro* of *McCormick* is satisfied by something short of a formalized and thoroughly articulated contractual arrangement (*i.e.,* merely knowing the payment was made in return for official acts is enough).").  And while *McCormick* requires an "explicit promise or undertaking" by a public official in exchange for a campaign contribution, 500 U.S. at 273, this does not mean that the *quid pro quo* must be stated in "express terms, for otherwise the law's effect could be frustrated by knowing winks and nods."  *Evans*, 504 U.S. at 274 (Kennedy, J., concurring).  As interpreted by Justice Kennedy's concurrence, the "explicit" requirement in *McCormick* means that "[t]he inducement from the official is criminal if it is express *or* if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it."  *Id.* (emphasis added); *United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011) ("Explicit, however, does not mean *express*."); *see also Menendez*, 132 F. Supp. 3d at 641.

Here, the Government has satisfied *McCormick* by pleading that a public official accepted money, understanding that it was in exchange for a specific requested exercise of official power.  *See Evans*, 504 U.S. at 258; *Salahuddin*, 765 F.3d at 343 n.9.  According to the Superseding Indictment, Green accepted a stream of benefits, including campaign contributions, in return for the PSO maintaining and expanding the contractual relationship with Davis's companies, Reach and RCS.  Super. Ind., pp. 7-8, ¶ 31.  Green allegedly accepted this stream of personal benefits, knowing that the benefits were given in return for Reach and RCS "maintaining and receiving more business, services, and fees from the PSO."  Super. Ind., pp.8-9, ¶ 33.  And Davis gave Green these benefits in exchange for Reach and RCS "maintaining and receiving more business, services, and fees from the PSO."  Super. Ind., p. 8, ¶ 32.  These allegations are sufficient under *McCormick*:  they tether Davis's campaign contributions to the official act of PSO contracting with Davis's companies.  Although the Government has not

pleaded a written document memorializing the *quid pro quo* or express words to that effect, that

is not required under *McCormick*.  *See Evans*, 504 U.S. at 274 (Kennedy, J., concurring).

Rather, because Green allegedly knew that Davis's campaign contributions were given to him in

exchange for maintaining and expanding Reach and RCS's business with the PSO, the Counts

for honest services fraud comply with *McCormick*.[7]  *See Evans*, 504 U.S. at 267 (holding that

passive acceptance of a payment by a public official who knows that he is being offered payment

in exchange for a specific requested exercise of official power constitutes Hobbs Act extortion);

*Salahuddin*, 765 F.3d at 343 n.9 (holding that public official's receipt of political contribution

"knowing that it is given in exchange for an *explicit promise* or understanding by the official to

perform or not to perform a specific official act" was a permissible jury instruction under

*McCormick*).

### B.  Conspiracy

"An indictment charging a conspiracy under 18 U.S.C. § 371 need not specifically plead

all of the elements of the underlying substantive offense."  *United States v. Werme*, 939 F.2d

108, 112 (3d Cir. 1991).  That is because "conspiracy is the gist of the offense," and the

indictment accordingly "need not plead the substantive offense letter-perfect because the purpose

of the conspiracy may have been accomplished even though such activity fell short of

completing a substantive offense."  *Id.* (quoting *United States v. Knox Coal Co.*, 347 F.2d 33, 38

---

[7] Although Defendants contend that the "stream of personal benefits" theory of criminal liability here is impermissible because it "groups Constitutionally protected campaign contributions with non-campaign benefits," the campaign contributions need not be the sole bribe or motivation for the exercise of Green's official power.  *See United States v. Bryant*, 655 F.3d 232, 242 (3d Cir. 2011) (noting a jury need not find that a bribe was the "sole impetus" for the public official's actions).  Thus, as a matter of pleading, Counts II to V are sufficient when they allege that Green accepted different forms of monetary benefits (including campaign contributions) as part of the *quid pro quo*.  Besides their argument based on *McCormick*'s purported pleading requirement, Defendants have not otherwise identified additional pleading issues with respect to the Counts for honest services fraud.

(3d Cir. 1965)). Thus, to be legally sufficient, a conspiracy count "need only set forth 'the agreement and specific intent to commit an unlawful act, and when required by statute, an overt act.'" *Id.* (quoting *United States v. Wander*, 601 F.2d 1251, 1259 (3d Cir. 1979)).

Count I of the Superseding Indictment meets the pleading requirements for conspiracy under 18 U.S.C. § 371. The allegations are that Davis and Green agreed to commit honest services fraud and Hobbs Act extortion. Sup. Ind., p. 7, ¶ 30. It asserts further that the Defendants intended to defraud Philadelphia and its citizens of Green's honest services as Sheriff. Sup. Ind., p. 7, ¶ 30. Lastly, Count I pleaded overt acts such as Reach's receipt of two checks dated December 29, 2010 for advertising invoices. Sup. Ind., pp. 22-23, ¶ 51.

### C. Motion to Strike

Defendants alternatively seek to strike all allegations related to the campaign contributions from the Superseding Indictment as surplusage. Fed. R. Crim. P. 7(d). "[U]pon the defendant's timely motion, the court may strike surplusage from the indictment or information when it is both irrelevant (or immaterial) and prejudicial." *United States v. Hedgepeth*, 434 F.3d 609, 612 (3d Cir. 2006). The standard for striking surplusage is conjunctive, requiring that the material be both irrelevant *and* prejudicial. *Id.* "Motions to strike surplusage are rarely granted." *Id.* at 611.

Defendants' request to strike shall be denied because the allegations regarding Davis's campaign contributions to Green are relevant. As noted above, the campaign contributions are part of the purportedly illegal *quid pro quo* that supports the Superseding Indictment's various counts.

In conclusion, Defendants' motion to dismiss Counts I to V for failure to state an offense, or, in the alternative, to strike all allegations of campaign contribution from the Superseding Indictment is denied.

14

## V.     PURPORTED ERROR IN GRAND JURY INSTRUCTIONS

Lastly, Defendants contend that, because the Government provided erroneous instructions to the grand jury, Counts I to V of the Superseding Indictment should be dismissed. In particular, Defendants argue that the Government improperly claimed that Green violated provisions of both the Philadelphia Home Rule Charter ("Home Rule Charter") and Philadelphia Code – documents that, they assert, do not apply to the Sheriff as a matter of law when he contracts with companies to sell properties at the Sheriff's sales.  Defendants alternatively move to strike references to the Home Rule Charter and Philadelphia Code in the Superseding indictment for the same reason.

### A.  Motion to Dismiss under *Bank of Nova Scotia* Standard

The grand jury serves two important constitutional functions: "both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions."  *United States v. Calandra*, 414 U.S. 338, 343 (1974).  "*Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988) established the standard for dismissing an indictment based on error in a grand jury proceeding."  *United States v. Soberon*, 929 F.2d 935, 939 (3d Cir. 1991).  In *Bank of Nova Scotia*, the Supreme Court held that, under the doctrine of harmless error, "a district court may not dismiss an indictment on the basis of prosecutorial misconduct before the grand jury without making a factual finding that the defendant was prejudiced by that misconduct."[8]  *Id.* (citing *Bank of Nova Scotia*, 487 U.S. at 255).  Prejudice results only if it is established that "the violation substantially influenced the grand jury's decision to indict," or if there is "grave doubt that the decision to indict was free

---

[8] Review for harmless error governs when a criminal defendant does not allege a structural error or fundamental unfairness in the grand jury proceedings.  *United States v. Perez*, 246 Fed. App'x 140, 143 (3d Cir. 2007). Defendants here have alleged neither.

from the substantial influence of such violations."  *Id*. at 939-40 (quoting *Bank of Nova Scotia*, 487 U.S. at 256) (internal quotation marks omitted).  Thus, to prevail in their joint motion to dismiss, Defendants must show that (1) the instructions to the grand jury were erroneous; and (2) the error was prejudicial.

The crux of the matter is whether the Home Rule Charter and Philadelphia Code apply to Green's conduct when he contracted with Reach and RCS to advertise the Sheriff's sales.  The Home Rule Charter, § 4-400(c), requires that Philadelphia's Law Department "prepare or approve all contracts, bonds and other instruments in writing ***in which the City is concerned***. . . ."  (emphasis added).  The Philadelphia Code, Title 17-1400 *et seq.*, requires that any "City Agency" that seeks to enter into a "Non-Competitively Bid Contract" must, *inter alia*, notify the City's "Procurement Department"; "publish on the City's official website . . . a notice of the availability of such contracting opportunity"; and "award the contract only to a party that completes an application form supplied by such City Agency. . . ."  Although the Government claims that Green failed to comply with both provisions, Defendants argue that neither provision applies because Green did not perform a municipal function when the PSO contracted with Reach and RCS.  Instead, Green's contention is that he acted as an agent of Pennsylvania's state courts in executing the Sheriff's sales.  Thus, according to Defendants, it was erroneous for the Government to have informed the grand jury that Green violated the Home Rule Charter and Philadelphia Code when neither document governed the PSO's transaction with Reach and RCS.

The Government did not err because Green, as Sheriff, was a City officer subject to City regulations.  Under the Pennsylvania Constitution, Sheriffs are deemed "county officers."  Pa. Const. Art. 9, § 4.  County officers subsequently became "officers of the City of Philadelphia" through the City-County Consolidation Amendment of the Pennsylvania Constitution.  *Id*. §

16

13(f).  Accordingly, Sheriffs are now City officers.  The City-County Consolidation Amendment was not simply a change in nomenclature.  *Lennox v. Clark*, 372 Pa. 355, 365 (1963) ("[I]t would be wholly incredible to suppose that the only accomplishment intended by the City-County Consolidation Amendment was the merely puerile one of a change of titles . . ."). In *Lennox*, the Supreme Court of Pennsylvania analyzed the effect of the City-County Consolidation Amendment and held that the conversion in title meant that newly coined City officers "automatically became subject thereby to the laws then in effect governing and regulating city officers and employees, and also, of course, to any such laws as might thereafter become effective."  *Id.* at 366.  With this categorical rule, the *Lennox* Court concluded that the City-County Consolidation Amendment applied to the Sheriff's office.  *See id*. at 360 ("The appeals here presented concern the office of the Sheriff . . . "); *id.* at 368; *id.* at 383 ("We agree with the majority of this Court which . . . hold (a) that the Sheriff's Office . . . were county offices and (b) that the City-County Constitutional Amendment and the Philadelphia Home Rule Charter apply to them and make them now City offices . . .") (Bell, J., concurring); *Otto v. Clark*, 86 Pa. D. & C. 420, 422 (1954) (noting that *Lennox* held that the City-County Consolidation Amendment "was self-executing in bringing the county offices within the framework of the city government, and that upon its adoption . . . the offices of the sheriff . . . became city offices. . . .").

Therefore, under *Lennox*, both the Home Rule Charter and Philadelphia Code, as laws regulating City officers, applied to Green when he was Sheriff.  *See* Philadelphia Code Title 1-103(1)(a) (defining "Agency" as "[a]ny ***office***, department, board, or commission ***of the City*** including any ***officer***, employee, or other authorized representative thereof, other than the Council or the courts.") (emphasis added); *Lennox*, 372 Pa. at 370 ("The one phase is completed in that the county offices are now part of the municipal government and that all their officers and

employees are now city officers and employees and ***as such bound by the provisions of the Charter*** concerning such officers and employees.") (emphasis added).

Defendants' argument that Green, as Sheriff, served as an agent of Pennsylvania's state courts when contracting with Davis's companies is unavailing under *Lennox*.  As an initial matter, *Lennox* was categorical in concluding that the Sheriff was a City officer under the City-County Consolidation Amendment.  Notably, it did not create an exemption from the City-County Consolidation Amendment for the Sheriff, as it did for the Prothonotary of the Court of Common Pleas and the Register of Wills.  *See id.* at 370.  Those two offices were exempt because: (a) "they [were] each subject to a special provision of [Pennsylvania's] Constitution" and (b) "they [were] so closely integrated in the judicial branch of the government."  *Id.* at 370.

Neither justification is present here.  First, Defendants identify no "special provision" of the Pennsylvania Constitution that would merit exempting the Sheriff from *Lennox*'s categorical rule.  *See id.*; *see also Commonwealth ex rel. Specter v. Freed*, 424 Pa. 508, 517 n.9 (1967); *Otto*, 86 Pa. D. & C. at 428 (noting that the Prothonotary and Register of Wills were specifically mentioned in the judiciary article of Pennsylvania's Constitution).  Second, Defendants cite to no authority which holds that the Sheriff occupies a secondary role as a quasi-judicial officer (in addition to City officer) when he contracts with a company to promote the Sheriff's sales.  Indeed, there is no indication that the PSO's *contract* with Davis's companies executes a specific Commonwealth judicial process (such as a court order) or is otherwise closely integrated with an act of the Commonwealth's judicial branch.  *Cf. Gage v. Wells Fargo Bank, NA AS*, 521 Fed. App'x 49, 51 (3d Cir. 2013) (holding that sheriff was entitled to qualified immunity for enforcing foreclosure judgment and conducting sale of property); *Conklin v. Anthou*, 495 Fed. App'x 257, 264 (3d Cir. 2012) (holding that sheriff was entitled to quasi-judicial immunity when

carrying out a foreclosure sale pursuant to a facially valid court order); *Pennsylvania R.R. Co. v. Heister*, 8 Pa. 445, 452 (1848) (concluding that Sheriff's selection of jurors "is a judicial act, requiring judgment and discretion, which cannot be deputed to another.").

At oral argument, counsel for Defendants contended that that even under the City-County Consolidation Amendment, some former county officers maintained a dual role because they performed "certain duties on behalf of the Commonwealth and to that extent were acting in the capacity of an officer, agent or employee of the State." *Lennox*, 372 Pa. at 369. Nevertheless, the *Lennox* court concluded that the former county officers' performance of such service on behalf of the Commonwealth "[did] not conflict with their general status as *city* officers" after the City-County Consolidation Amendment's enactment. *Id.*; *see also Otto*, 86 Pa. D. & C. at 422 ("The [*Lennox*] court stated that although the functions and duties of these officers were to remain the same until changed by the legislature, nothing remained to be done to achieve the transition of the offices from county to municipal agencies, as the transition was then absolute.")

Thus, the Government did not err when it presented the grand jury with allegations related to Green's purported violations of the Home Rule Charter and Philadelphia Code. Because there was no error, Defendants' motion to dismiss based on the Government's instructions of law to the grand jury shall be denied.

Even assuming the obverse result – that the Government's grand jury instructions were incorrect – Defendants would not meet the standard of *Bank of Nova Scotia* because they cannot establish prejudice. Defendants have not shown that the grand jury instructions substantially influenced the grand jury's decision to indict, nor have they demonstrated that there is "'grave doubt' that the decision to indict was free from the substantial influence of such violations." *See Soberon*, 929 F.2d at 939-40; *see also* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or

variance that does not affect substantial rights must be disregarded.").  That is because Counts I

to V of the Superseding Indictment allege numerous other acts besides violations of the Home

Rule Charter and Philadelphia Code that informed the grand jury's decision to indict. [9]  *See*

*Costello v. United States*, 350 U.S. 359 (1956) ("[A]n indictment returned by a legally

constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its

face, is enough to call for trial of the charge on its merits."); *United States v. Wright*, 667 F.2d

793, 796 (9th Cir. 1982) ("Erroneous grand jury instructions do not automatically invalidate an

otherwise proper grand jury indictment."); *United States v. Burger*, 773 F. Supp. 1430, 1435 (D.

Kan. 1991) (citing *United States v. Buchanan*, 787 F.2d 477, 487 (10th Cir. 1986), *cert. denied*,

494 U.S. 1088 (1990)) ("Giving erroneous legal instructions to a grand jury does not constitute

grounds for dismissing an indictment valid on its face.").

### B.  Motion to Strike

Defendants' request to strike allegations relating to the Home Rule Charter and

Philadelphia Code under Rule 7(d) of the Federal Rules of Criminal Procedure shall be denied

because the allegations are material.  *See Hedgepeth*, 434 F.3d at 612.  References to the two

documents are relevant insofar as they pertain to Green's knowledge of the laws, his alleged

refusal to comply with them, and the Defendants' conspiracy as alleged in Count I to conceal the

scope of their *quid pro quo*.

---

[9] For instance, Count I alleges (among other things) the receipt of two checks of over $25,000 by Davis's companies from the PSO in support of the honest services fraud and Hobbs Act extortion conspiracy.  Counts II to IV similarly identify monetary payments as part of the purportedly illegal *quid pro quo* between Green and Davis.  Count V alleges that Green's campaign committee falsely reported $30,000 of unpaid campaign debt to one of Davis's companies.

An appropriate order follows.

**BY THE COURT:**

**/s/ Wendy Beetlestone**

_____

**Date: 2/9/18**                    **WENDY BEETLESTONE, J.**